STEPHEN HARBERT v. NEILL BROS. & CO.

1. GALVESTON COTTON MARKET—RULES OF.—A sale on a basis is made by the parties agreeing, the one to sell, and the other to buy a given number of bales of cotton at an agreed price per pound, for "good ordinary cotton," that being the usual grade mentioned in quotations, and to which all others are referred. Cotton delivered on such a sale, going above or below "good ordinary," is paid for ratably, at a higher or lower price, according to the grade. As soon as possible, the factor designates the cotton sold by marks and number of bales. This is usually done first in the weighing order or classing order. The cotton is then classed according to the standard of the market. When the weight and classification of each bale is ascertained, the factor makes an invoice, in which the aggregate weight of all the bales in each grade, with the price carried out, so as to show the sum-total of the cost, which is handed to the buyer, and the money paid, which constitutes a complete sale.

2. SAME.—The ascertainment of the amount to be paid for cotton sold

on a basis by its classification, is, in effect, what the factor does after its sale by sample, by his report of sales to each consignor whose cotton is included in the same sale. Such sale could act upon cotton in hand or under control of factor.

3. ADVANCES ON UNCOMPLETED SALE.—The effect of an advance on such sale on a delivery order before weighing must depend upon the custom and usage in making such sale; but if such payment was made for use of the factor, it would not bind the cotton as against the owner, and would be illegal.

5. USAGES OF TRADE.—FACTORS.—Factors are governed by usage of the trade of the place where they transact business, in absence of express authority. Unless warranted by usage, a factor could not sell on credit, and he is bound by usage and custom in making and consummating his sales. Purchasers are charged with knowledge of their usages, and are bound by them.

5. SAME.—Doubtful whether evidence shows sales on a basis to be recognized in Galveston market; but the verdict has so found, and will not be disturbed.

6. FACT CASE.—See facts not in accordance with usage, and which if so would be held unlawful.

7. LIMITS OF USAGE AS TO POWER OF FACTORS.—Usage could not legalize sales on credit, or permit enforcement as against future shipments upon such contract.

APPEAL from Galveston. Tried below before the Hon. A. P. McCormick.

This was a trial of the right of. property under the statute, in thirty-two bales of cotton which had been shipped by Stephen Harbert to his factors, A. Sessums, Powell & Co., at Galveston. After the death of Sessums, and insolvency of the firm, Harbert brought suit by sequestration for the thirty-two bales of cotton against "The Southern Cotton Press and Manufacturing Company," in whose warehouse it was stored. The cotton was seized by the sheriff; and February 14, 1873, Charles M. Todd and Henry M. Neill, partners, under firm-name of "Neill Bros. & Co.," filed their affidavit and claim bond under the statute. The cotton was appraised by the sheriff at $2,720.

Two trials were had, resulting in verdicts for the claimants, the judge setting the verdicts aside. The third trial was had December 16, 1874, and upon a third verdict, judgment was

rendered for the claimants, and from that judgment Harbert appealed.

The facts are sufficiently given in the opinion.

*R. G. Street*, for appellant.—Plaintiff denies (1) that A. Sessums, Powell & Co. ever made a sale of this cotton, "on a basis or otherwise"; and he affirms (2) that the transaction called a "sale on a basis" is not a sale; (3) that the evidence, so far from showing that it is a customary character of transaction by factors in the Galveston cotton market, shows affirmatively that it is a reprehensible habit "of speculating or raising money under a financial pressure," on the part of the particular factor, and always so recognized when made; and (4) that it is in nowise a transaction by which, in law, equity, or good conscience, he ought to be held bound.

The points made by the appellant here, are that the verdict and judgment are contrary to, and unsupported by, the law and the evidence.

No exception was taken to the instructions given by the court, and no special charges were asked. The district judge, having twice set aside the verdict on the ground that it was contrary to the law of the case applicable to the facts as defined in his instructions, upon the like result attending a third trial, has remitted us to this tribunal for an authoritative exposition of the questions involved.

A thorough appreciation of the correct principles and sound policy that must induce a reluctance on the part of this court in taking up a record for the purpose of determining whether, under the law, the evidence supports the verdict and the judgment, would deter me from urging this as a ground for reversal in any ordinary case; but this is a case in which I am emboldened to rely on this ground with the greatest confidence, and for the reason, that taking the evidence for claimants alone, it is believed that it not only furnishes no basis for the verdict, but makes apparent that the verdict can only be maintained at the price of a sacrifice of every sound prin-

ciple of law that underlies, governs, and regulates the inter-course between the planter and his factor.

The witness Todd, one of the claimants, occupies some four pages of this record in describing this transaction, called "sale on basis," and seven or eight more in relating the details of this particular sale. It appears that on the 4th day of November, 1872, claimants, through their brokers, made a contract with A. Sessums, Powell & Co., for the purchase of four hundred and fifty bales of cotton; "no samples were exposed, and no particular cotton was designated, and A. Sessums, Powell & Co. never issued weighing or classing orders or gave invoice for the thirty-two bales of cotton herein sued for."

Indeed, nothing was done in consummation of, in evidence of, or in pursuance of the so-called sale at that time, except that Richards & Hawkins, as middlemen, furnished claimants with what they call a sale note: "GALVESTON, *November 4, 1872.*—Purchased for account of Messrs. Neill Bros. & Co., from A. Sessums, Powell & Co., four hundred and fifty bales of cotton, at basis of 15¼ cents for good ordinary.—RICHARDS & HAWKINS."

Nor is it pretended that anything that should have been done by either party at the time was omitted to be done. The cause of complaint arises long subsequent, and is that A. Sessums, Powell & Co. were too slow in making delivery.

What, then, in contemplation of law, was the status and effect of what was done between those parties on the 4th day of November, 1872?

There was no sale, but a mere executory contract of sale; and therefore no act of A. Sessums, Powell & Co. as plaintiff's factors, but a private contract of their own for future delivery; and Harbert's cotton had as well be taken to pay a promissory note of A. Sessums, Powell & Co. as appropriated to the fulfillment of this contract for futures. The only ordinary element of the gambling contract for the future delivery of cotton that is wanting, is the omission of a day of delivery;

and while, in absence of evidence, the law would construe it to imply a present delivery, or delivery within a reasonable time, according to the circumstance of the particular case, we are not left here to a mere implication of law, but, looking to the conduct of the parties, we find that no demand was made for delivery or designation of the cotton the next day or the next week. Evidently no immediate delivery was contemplated, and it was in substance a contract for futures, the omission of a specific time of delivery only giving the buyer the power to oppress the seller by an untimely demand.

But it will be said claimant's rights against this cotton become fixed by the delivery order on 19th day of November. To this, the reply is obvious: a cotton factor will not be allowed to fill his speculative contracts for future delivery out of cotton confided to him as factor; that his only authority to dispose of such cotton is presumed to be on its merits, in open market, for cash, unless some other reasonable custom is affirmatively shown.

It is also a significant fact, that, in this transaction, the preliminaries detailed by the witness Todd as the usual incidents of a sale on a basis were not pursued. He says that weighing and classing orders were usually first issued, but that in this case Mr. Sessums gave him an absolute order on the warehouse, for the delivery of the cotton, in the first instance; and to this day we know nothing of the weights and classification of the cotton, except as ascertained by the claimants.

No elaboration will be attempted. It is believed that the statement of a few honest, sound principles respecting the rights of one person to deal with the property of another, will suffice to dispose of all the ingenuity that has been displayed in getting up this case by the claimants.

We have not believed that the court would permit this sort of custom, upon evidence however clear, to deprive the shipper of his rights to his property; for it would contravene good morals and fair dealing. But it is proper that reference

should be made to the character of that evidence. It will be found, we think, to amount to this: that when a particular factor wishes to speculate, or is under a financial pressure, he can usually find an accommodating buyer to oblige him with advances on a contract for futures, or sale "on a basis." But the law merchant, gradually adapting itself as it does to the requirements of business, is not yet subject to such mutation as to subordinate the rights of all mankind to the necessities of a particular factor or the avidity of a particular buyer.

There is nothing in the record that approaches in dignity or in certainty the evidence requisite to establish a commercial usage.

It will be seen, that it is attempted to affect the plaintiff with an implied knowledge of a usage in the Galveston cotton market, that the president of the cotton exchange, and the numerous other witnesses of long experience and high standing in that business, introduced by the plaintiff, are utterly ignorant of. We dismiss this branch of the case, affirming that there is not the slightest foundation in fact or in evidence for affixing this stigma upon the commission merchants of Galveston.

2d. The next point made by the plaintiff, is that the court erred in excluding the evidence offered to show the plaintiff's instruction to A. Sessums, Powell .& Co., with reference to holding his cotton until spring.

While we appreciate the latter ground, upon which the court based its ruling, and believe that there was no evidence, such as is required by the law, to support the pretended custom, we have yet to insist, that as this evidence was submitted by the instructions of the court to the jury, and the question was one of regularity or irregularity, there may well be a distinction between the extent of the evidence that would be required to vitiate the sale, and such as would suffice only to put the purchaser on inquiry and affect him with knowledge of the actual authority of A. Sessums, Powell & Co. to sell.

It would certainly seem possible that the general features of a sale by a factor may be in conformity with custom, and yet there may be such suspicious circumstances attending it, known to the buyer, as would suffice to put him on inquiry.

*J. Z. H. Scott,* for appellees.—* * * The second question—Is the result of the case as it now stands contrary to the law and the evidence?—requires more lengthy notice.

The rights of the appellees depending upon a factor's sale of the cotton in controversy, it is necessary to determine what are the requisites of a valid sale by a factor, and whether or not these requisites enter into the transaction shown in evidence.

A sale by a factor and a sale by a principal differ only in this: that a principal may effect a sale in any manner he pleases, whereas a factor is confined to the usual modes which obtain in the market where he deals.

That sales of the character shown in this case were usual in the course of trade by factors in Galveston, is proven positively by several witnesses; that they were frequent, is proven by all; and upon their testimony three different juries have answered affirmatively, and the court below has ruled in effect that it is now an open question in this case.

In view of these facts, we do not believe this court can enter upon the question of customary usage, unless the presumption of correctness, hitherto entertained in support of the action of *nisi prius* courts and of juries, is to be abolished.

A sale takes place when one party agrees to sell and the other party agrees to buy a certain thing of value, for a certain stipulated price. Certainly as to price it is sufficient, if it be so far agreed upon as to render it capable of being ascertained by reference to fixed and standard rules, such as can be applied by persons of ordinary experience and skill, so as to arrive uniformly at the same result. The total value may have to be afterwards ascertained, and the price may be unpaid; but these facts do not affect the validity of the sale.

The rights of the parties are fixed at the time of the agreement, and the purchaser may tender the price and sue for the property, or the seller may tender the property and sue for the price. (29 Tex., 204, and authorities cited, particularly Crofoot *v.* Bennett, 2 Comst., 260.)

Was there such a transaction in evidence affecting the property in suit? There can be no doubt of it, when the nature of a sale on a basis is considered. The evidence showed that any person accustomed to and familiar with cotton can, by simple inspection of a given sample, designate its quality by reference to the fixed standard classification in the market. The court is familiar with sales by sample, and such sales almost invariably present themselves for judicial consideration upon the simple question,—Does the quality of the bulk correspond with the sample exhibited? If it does, the sale is held good, and *vice versa.* The question of correspondence in quality is a fact to be referred to a jury, it is true, when contested, but, like other disputed points, is none the less a fact before than after the verdict. So with the classification of cotton. Each grade has its name in the market, and all cotton of corresponding quality is called by that name. And whether a given sample or bale be low ordinary, strict low ordinary, ordinary, strict ordinary, good ordinary, strict good ordinary, low middling, or strict low middling, &c., to the end of the chapter, is also a question of fact, ascertainable by precisely the same method, and with precisely the same certainty, that a sample of cotton is identified in quality with the bulk from which it is drawn. The grade of the given sample or bale being thus ascertained, the agreement of the parties attaches the price per pound of that grade, which, being multiplied by the weight of the bale classed, either by sample or by itself, gives the price of the bale. The same operation is substantially performed with reference to each bale, and the whole amount of the invoice is thus ascertained. There is no difference in principle between the "sale by sample" and "on a basis"; the difference consists in the mode of applying

the sample principle. In one instance, the buyer stipulates for only one quality, *i. e.*, that of the sample exhibited; in the other, he agrees to take all qualities, each at a specified price. That this is the case, is shown from the description, by the witness Wells, of the mode of distributing equal justice to the respective owners of several lots of cotton, included in one sale by sample, and its fairness is apparent without argument.

But after the agreement to sell, there remains to be designated the particular articles to which it shall apply before it assumed the perfect form of a sale. Prior to this designation, the contract is purely executory; afterwards, it is executed, so far as fixing the rights of the parties who are concerned. The designation might be contemporaneous with the agreement; *e. g.*, when the factor and buyer, (as in sales by sample,) referring to a particular lot of samples having the marks of their respective bales attached, or referring to the bales themselves and having them in sight, should agree the one to sell and the other to buy at twenty cents for good ordinary, higher grades each one cent more per pound, and lower one cent less, according to classification. This is not always practicable, however, and the practice is to designate it as soon as possible after sale is agreed to by marks and number of bales. This designation is frequently made by a delivery order, in cases where an advance of part or all of the price is wanted by the factor. At other times, it is by weighing and classing orders. In the present instance, it is claimed that the delivery order of November 19, 1872, for two hundred and ninety-seven bales, including the thirty-two bales in suit, was a designation of the cotton, and that thereupon the agreement of sale attached to it.

It may be said that sales on a basis are in themselves illegal. We have shown that such sales may be fairly made, and if customary they may be lawfully made, by a factor. From the very nature of the circumstances under which sales on a basis are made, it is reasonable to suppose this one

species of sale would be resorted to. The samples are not at hand, and the factor, to whose discretion the owner leaves the time of selling his cotton, is apprehensive of a decline before the samples can be exposed. The sale by sample is impossible. The sale on a basis is the only other method of selling with reference to quality. This emergency must present itself with great frequency in cotton markets of any size; but whether frequent or rare,.the factor's authority is presumably adequate to the accomplishment of the object of his agency under any and all circumstances, however rare; and any of the usual modes and means of so doing are lawful, especially if it be circumstantial only, and does not in substance exceed his right and duty. A literal adherence to even the common course of business may sometimes, under peculiar circumstances, defeat the very object of the agency; and new and unexpected emergencies arise, by which the authority is expanded beyond its ordinary limit, and justify a deviation from its ordinary limitations and import. (Story on Agency, secs. 85, 141, *et seq.*)

By the same reasoning, a custom in a trade by which emergencies more or less frequent are met, with adequate and appropriate provisions to overcome them will also be upheld. But it will be urged that the delay intervening between the purchase and invoices was unusual, and no emergency demanded it. True; but was that delay part of the contract of sale? If so, it might be charged as evidencing an unusual mode of sale. The contrary is the fact. The whole testimony shows the appellants to have been parties to the delay under protest, and only by way of indulgence to Sessums, who was continually promising and excusing himself on grounds of press of business. I submit, that if the contract contain nothing unusual up to the time of vesting rights in the parties respectively, no default on one side can operate to defeat the rights of the other; nor can modifications of the original agreement, or yielding of rights under it on the part of the appellants, in order to accommodate A. Sessums, Powell &

Co., or to close up the matter for their own convenience, be construed into either an abandonment or forfeiture of the original contract. I refer to the transaction of returning sixteen bales of cotton at Sessums' request, after he had embarrassed himself by contracting to sell the same cotton to two different persons, and to the closing out of four bales after Sessums' death, at a different price from that originally agreed on.

It may as well be said, on the question of delay, that an agreement of sale of any specified cotton, made in any of the most usual modes, would become unusual, and consequently invalid, by the factor refusing to carry it out, and postponing it to the furthest term of the law's delay. The factor may introduce as many unusual features into a sale as he pleases after it is perfected, but they cannot operate to defeat rights when once acquired.

I submit, that, under the evidence, the jury might reasonably have found that sales on a basis were customary in Galveston; that the cotton in controversy was intended by the parties to be included in an agreement for such a sale, and that both these questions are involved in and determined by the verdict.

I also submit, that there is nothing in a sale on a basis which is contrary to law; that, as above shown, it is fair and equitable to the owner; and any sale, even by sample, in which the principles of a sale on a basis are not applied, is unfair.

MOORE, ASSOCIATE JUSTICE.—On the 4th day of November, 1872, appellees, Neill Bros. & Co., through their brokers, Richards & Hawkins, entered into an executory contract with A. Sessums, Powell & Co., cotton factors in the city of Galveston, for the purchase of four hundred and fifty bales of cotton, "on a basis" of $15\frac{1}{4}$ cents per pound for good ordinary cotton. No specific cotton, however, was designated or identified as the subject of this sale; and it was not shown

on the trial of this case that the thirty-two bales of cotton in controversy in this suit were then either in the possession of, or subject to the control of, A. Sessums, Powell & Co.  In fulfillment of this executory contract, said factors, on the 19th of November, 1872, gave to appellees a " delivery order" on the warehouse where they were stored for two hundred and ninety-seven bales of cotton, including the thirty-two bales for which this suit was brought by appellant.  Appellees appear to have delivered the order on the same day, and the cotton was thereupon entered in the books of the warehouse as held in storage for them, and they, on the same day, paid A. Sessums, Powell & Co. for said two hundred and ninety-seven bales of cotton the estimated price, on the basis of 15¼ cents per pound for good ordinary cotton, as stipulated by said agreement, as previously stated.  But it is not pretended, so far as concerns this particular cotton, that the contract was fully and entirely consummated by weighing and classifying it, so as to ascertain the definite amount to be paid for it on the basis agreed upon, until after the death of A. Sessums, January 31, 1873, and the hopeless insolvency of said factors, A. Sessums, Powell & Co.  After the death of Sessums, however, appellees caused it to be weighed by the public weigher, and to be classified by a cotton broker, when it was found that the payment for it, as made on estimate, exceeded the contract price, and that the difference between the amount paid upon estimate and the contract price, ascertained by its weight and classification as aforesaid, was due appellees.

That the cotton sued for belonged to appellant prior to its alleged purchase by appellees, and was in the possession of said A. Sessums, Powell & Co., as his factors, on said 19th of November, 1872, was not controverted on the trial of the case, and, indeed, did not admit of dispute.  The mooted question between the parties, was whether the appellees, by the executory contract of November 4, 1872, and the delivery order, including this particular cotton, given fifteen days

afterwards by said factors, and the payment as stated above, acquired a title which they could maintain against appellant.

The correct determination of this proposition, counsel seem to suppose, must turn, in the main, upon the fact whether the transaction between appellees and said factors was, in legal effect, an hypothecation of the cotton by the factors as security for the money which they got from appellees when the delivery order was given for the cotton, or whether it was a sale of the cotton on a basis; and if the latter, whether factors are authorized by law, or the custom and usage of business in Galveston, to sell the cotton of their consignors on a " basis."

Evidently, if the testimony of the witnesses for appellees is entitled to credit, the parties did not suppose that the cotton was merely hypothecated with appellees to secure the repayment of the money which the factors received on the delivery order. If such is the real character or legal effect of the transaction, it evidently results from its intrinsic facts, and not from the intention of the parties. But we see no good reason to say that the transaction was in fact a mere hypothecation of the cotton, or should be so regarded in law. Whether the delivery order was given to secure money borrowed by the factors from appellees on an hypothecation of the cotton, was fairly submitted to the jury; and no good reason has been shown us for dissatisfaction, in this particular, with their verdict. But although the cotton may not have been hypothecated, the transaction regarding it may not have been a sale on a basis; or if so, such sales, especially when made and consummated as in this instance, may be illegal or contrary to general custom for the sale of cotton, by factors, in the Galveston market.

Let us, then, inquire whether a factor may, without special authority, sell the cotton of his consignor on a " basis"; and if so, was this the character of this transaction, and was it so far consummated as to vest title to the cotton in appellees ? To answer these questions, it is necessary for us to under-

stand the nature and essential ingredients of such a sale. We are uninformed whether sales on a basis are customary or sanctioned by general usage in other markets than that of Galveston, if indeed they are so in it. We have been cited by counsel to no case in which such sales have been the subject of judicial construction or comment. We must therefore look to the statements of the witnesses who profess to understand and know how they are made, to determine whether this particular transaction was a sale on a basis, and whether there is any inherent vice in such sales that the court should not sanction or uphold them, although they may conform to the general custom where made.

All the witnesses who profess to know anything of this character of sale, who were examined upon the subject, say, in effect, that a sale on a basis is made by the parties agreeing, the one to sell and the other to buy a given number of bales of cotton at an agreed price per pound for " good ordinary cotton," that being the usual grade mentioned in quotations, and to which all others referred. Cotton delivered on such a sale, going above or below " good ordinary," is paid for ratably at a higher or lower price, according to the grade. As soon as possible, the factor designates the cotton sold by marks and numbers of bales; and this is usually done first in the weighing order or classing order. The cotton is then classed according to the standard classification of the market, the grade of each bale being ascertained in this process. As soon as the weights and classification are ascertained, the factor makes out an invoice, in which the aggregate weight of all the bales, comprising each grade of cotton in the lot, is multiplied by the price per pound of that grade; the whole amount is footed up, and the invoice, with a delivery order for the cotton, is given to the buyer, who pays the amount of the invoice, and the transaction is closed. Sometimes, however, as also in sales by samples, the factor needs money before the sale can be completed in this way; and in such case, either by express stipulation when making the sale, or

upon request afterwards, the buyer pays a portion or the whole of the estimated price of the cotton bought, the factor giving the buyer a delivery order upon the warehouse for a sufficiency of the cotton sold to amount in value to the money paid, the value of the cotton being estimated by the usual weights of cotton bales, and the agreed price per pound. When the exact amount of invoice is ascertained, the parties settle, by payment of the difference between the amount paid and the amount of the invoice to whichever party the difference may be due.

Now, if sales of this kind are sanctioned by the general usage of the trade, and we are to understand that the specific cotton thus sold is in possession of the factor, or under his control, and is identified at the time the bargain is made, or as soon as this may be reasonably done, in view of the nature of such transactions and the time required to consummate them, and when, from all the facts and circumstances of the case, and the general usage in making and concluding such bargains, it should, from its inception by the agreement to sell and buy to its final completion, or such stage of consummation as to transfer the title to the particular cotton sold to the purchaser, should be justly regarded as one entire transaction, I can see no inherent objection to such character of sales, or any reason why they might not be made by a factor just as well as sales by sample, if sanctioned by the usage of the trade where made. The ascertainment of the amount to be paid for cotton sold on a basis by its classification, is, in effect, just what the factor does after its sale by sample, by his report of sales to each consignor whose cotton is included in the same sale.

The effect of a payment on a delivery order before the weighing and classification of the cotton, whether the sale is made by sample or on a basis, must depend on the custom and usage in making such sale; and though sanctioned by the usage of trade, if the purchaser knew that such was the fact, or if he should be charged with knowledge that such payment

was for the individual and personal benefit of the factor, and not for the benefit and advantage of the consignor, unquestionably the sale would be illegal, and could not be enforced against the consignor.  Evidently, however, it cannot be inferred, simply from the fact that payment, in part or in whole, is made before the contract is finally closed, that such payment is for the benefit of the factor, and not the owner.  It may be, and no doubt often is the fact, that the consignor has drawn upon the cotton, and it is of vital importance for him to realize upon it at the earliest moment practicable.

In the absence of express authority, the power of a factor is unquestionably governed and regulated, in a great degree, by usage of the trade where the business is transacted; and unless warranted by usage, a factor cannot sell upon a credit. Evidently, he is also controlled by the same rules in making and consummating his sales.  Purchasers from factors are charged with knowledge of such usage, and are, equally with factors, bound by them.

It certainly cannot be denied that the weight of evidence, as exhibited by the record, preponderates against the proposition, that, by the general custom and usage of trade in the market of Galveston, factors are authorized to sell cotton on a basis.  But as the evidence is conflicting, if this cotton had been sold strictly on a basis, and there had been no departure from general usage of the market, or inherent vice in making and concluding the sale, the verdict of the jury would be conclusive, and should not be disturbed.

But it seems to be clear, from the evidence, that the time usually allowed for the consummation of the sales of cotton by factors in Galveston is limited to ten days.   Certainly it cannot be claimed that the usage of trade is such as to warrant so great a delay in concluding a sale as from the 4th of November to the 31st of the ensuing January.   But concede, as appellees insist, that the alleged sale was so far consummated by payment for the cotton on the delivery order given on the 19th of November as to vest the property in them,

and that the subsequent delay of the factors, without their consent and against their urgent demand for its prompt completion, will not affect their rights, still this does not relieve appellees from the dilemma in which the testimony places them. No excuse is given why nothing whatever was done from the 4th until the 19th of November towards the consummation of the sale, shown by the sale note, if there was at that time a sale. The appellee Todd, who was a witness, says, where a sale on a basis is agreed upon, "as soon thereafter as practicable, the factor designates the cotton sold, by marks and number of bales." And so say all the other witnesses. Now, can it even be plausibly insisted, when there was no designation of the cotton sold until fifteen days after the date of the sale-note, when only ten days were allowed by the usage of trade to consummate the entire transaction, and where no excuse for the unusual delay in taking this first and essential step towards completing the sale is shown, and where it does not appear that the purchaser ever demanded that this should be done, that a sale has been properly made and consummated in conformity to usual mode of sales by factors?

But there is another view of this transaction, which is of more essential importance in respect to the powers and functions of factors, and which conclusively nullifies appellees' claim to this cotton. It is not pretended that factors have authority to bind consignors by any other character of contract concerning cotton in their charge, except by a sale on a basis or by sample. It is not shown, or even attempted to be shown, that they are authorized to bind their consignors by executory contracts. It certainly cannot be inferred that the factor has authority to do so, because he has unlimited authority to make an absolute and immediate sale. Evidently the sale-note of the 4th of November imports merely an executory agreement for a sale of four hundred and fifty bales of cotton by A. Sessums, Powell & Co. to appellees. It is not, indeed, even an executory contract for the sale of appellant's

cotton. It had no more reference to his cotton than to that of any one else having cotton in possession or under control of said factors, or which they might themselves own, when called upon to consummate the contract by the delivery or designation of the cotton which they had agreed to sell. But it is said that though merely an executory agreement in the first instance, and while it may not have been binding if the parties had proceeded no further with it, yet, when the particular cotton was designated, and delivered and paid for, on the 19th of the month, it became an executed contract.

But has it been shown that factors are authorized to bind their consignors by executing contracts, or by fulfilling contracts into which they have entered, which did not relate to the business of their consignors, and when made were not binding on them? Though a factor may sell the cotton, it does not follow that he can deliver it in satisfaction of a contract made fifteen days previous thereto. Suppose it had been stipulated in this agreement, instead of being left to the option of the parties when the cotton agreed to be sold should be delivered, that the sellers would deliver to the purchasers, fifteen days from the date of the sale-note, the specified number of bales, can it be pretended that consignors would have been bound by such an agreement, or that such a transaction could properly be called a sale on basis? In what essential particular would such a transaction differ from a sale of "futures"?

To constitute a sale, there must not only be parties competent to contract, mutual consent, and a price, but also a subject of sale. Now, when this agreement was made, as no particular cotton was designated, it cannot be said that there was a subject of sale. Certainly, no one will say that this particular cotton was its subject. A factor, unlike a broker, may buy and sell in his own name; but, unlike the broker, he can only sell property in his possession or under his control. (Story on Sales, sec. 91.)

If a factor may legally carry out and bind his consignors

by such a contract as this, he might sell cotton not in fact forwarded to him until after its sale. It would enable him, if it was to his advantage, to deliver cotton of his own at the agreed price instead of that of his clients; while, if it turned out a losing bargain, he could shift the burden of it from his own shoulders to those of his consignors. Or he might select from among them who should reap the profit or bear the burden of the contract, as the case might be. A factor evidently has no authority to bind consignors by contracts admitting of such results. Neither law, public policy, nor sound morals will sanction or uphold them. If a contract on a basis, as defined by the witnesses, warrants the designation of the cotton at some indefinite subsequent day after the parties have agreed upon the price for a basis, there can be no hesitancy in saying, whether such character of sale is sanctioned by the usage or custom of trade or not, that it is illegal, and can receive no countenance in a court of justice. The assumption of power in the factor to deal with the property of the consignors in such manner, or to bind them by such contracts, is in direct conflict with the relations which should exist between them, and tends to the detriment of the one and the corruption of the other.

The verdict of the jury is neither warranted by the charge of the court, nor supported by the evidence, but is in palpable conflict with both.

The judgment is reversed and the cause remanded.

REVERSED AND REMANDED.